Change of the next case, Christopher Saffert v. Workers' Compensation Commission 510-0124. Counselor, please. May it please the Court, Mr. Provost, my name is Bruce Rousseau and I represent Hershey Seafert. The decision of the arbitrator is in accordance with the law, held true to the facts, it was consistent with the history of the Illinois black line cases, and its outcome wasn't extreme, it was fair to both parties. With all due respect to the Commission and the Commissioner who wrote this decision, this Commission reversal was just wrong in law and in fact. It got off limping out of the starting gate and it unraveled from there. One of the things I'm going to ask the Court to look at is the proper legal analysis of attacking outcome-determinative issues first, before going on to others, in order to find what constitutes dicta. Because I believe that after adverse rulings on certain issues, the Commission has a duty to stop writing. The first issue is the decision that the claim was denied based on notice. That Commission decision was just wrong as a matter of law, and it wasn't close. All Mr. Seafert had to do was give notice as soon as practicable and within the statute of limitations. And if there's a defect in that notice, all it does is throw it in the lap of the respondent to show it was unduly prejudiced by the timing of it. The arbitrator shined the light on that requirement in his decision. So the Commission didn't just make an error and overlook the prejudice requirement. It overruled it. Consolidated an offer, and the Commission didn't require any showing of prejudice. And the Commission was wrong twice on the notice issue, because if the petitioner fails on the issue of notice, the act says the right to proceed shall be barred. Once this ruling was made, the Commission should have quit writing, and everything it wrote after that was just dicta. Once this ruling was made, the words of the act are mandatory. The right to proceed shall be barred. And the right to proceed applies to the petitioner and also the Commission. Once a claim is barred, nobody proceeds. If the petitioner can't go through that door and try to resurrect his case, the Commission shouldn't be able to go through it to shoot the horse he came in on to. The Commission shouldn't get to say, well, we'll deny the claim on the grounds of notice, but in case we don't prevail on that one, we'll go ahead and rule on the other issues to help protect the denial. Pretty much the same pattern was followed on the issues of the statute of limitations. And there are two statute of limitations in this case. The statute of limitations for pneumoconiosis is five years from the date of last exposure. And the statute for obstructive disease is three years after the date of disabling, not exposure. As to the pneumoconiosis, the claim was filed four years after the date of last exposure. Denial of this claim based on the statute of limitations for pneumoconiosis is legal error. There's no way around it. It isn't a matter of discretion. And, like with the notice issues, the Act says that if the claim isn't filed within five years from the date of last exposure, the right to file such a claim shall be barred. It's mandatory. That's even less forgiving than the notice bar, which doesn't allow you to proceed. The statute of limitations section doesn't even allow you to file the claim. So, for a second reason, any discussion on ruling by the Commission after an adverse ruling on a statute of limitations is just dictative and gratuitous. And the Kassens Transport Company case is my site. In Kassens, the Supreme Court said that because they ruled on the jurisdiction issue, the case was over. It wasn't necessary for them to rule on the definition of disability. And, accordingly, the appellate court's discussion of that issue wasn't necessary either. Now, in that particular case, the Supreme Court affirmed the appellate court for other reasons. But Kassen controls here. After its ruling on notice, the Commission should have quit writing. After its ruling on the statute of limitations, the Commission should have quit writing. And where would you be? Pardon me? Where would you be if that was done? We'd come up here, and you'd make a ruling. And if your ruling was they were wrong on the statute of limitations, they were wrong on notice, then we'd go back, and then they'd try the issues. So then they decide the issues in the way that they did, and it comes back again? Then we lose. But we'll have done it the right way, and Mr. Seifert will have had a fair hearing. I can't get through my head how what they did provided him with an unfair hearing. Well, first of all, I don't know if it's within our discretion to talk about it. Well, but I mean, it's mandatory. I'm telling you that as I read it, it's mandatory. It says, shall not proceed after notice is found adversely. And if there's the statute of limitations filed, the claim is completely barred. When you go through that door, I mean, the petitioner can't go through that door and resurrect anything. It's over for him. So he's just got to sit there and watch with his hands tied while the Commission goes in and finds a bunch of other stuff. It says, well, so this court can say, well, you know, maybe he was wrong on the notice. Maybe he's wrong on the statute of limitations. But, you know, on those other ones, they might have been right. So it puts the petitioner in an unfair advantage. I think we understand the essence of your position, but what about the merits of the evidence? Obviously, the Commission found against the claimant. The Commission found against the claimant, and the reason they did so was clearly against the weight of the evidence. There were two experts or two sides to this, the experts for the petitioner and the experts for the respondent. But the Commission didn't decide those issues based on what the credentials were of those experts or on what their opinions were. The Commission decided based on the medical records, the treatment records. And there was nothing in these treatment records that could help you one way or another to rule in or rule out co-workers in the home. Let me ask you this. I thought the medical record, none of the claimants treating physicians believe the claimant's condition was related to his employment in the home. Is that correct? That is said. That is wrong. You can't find that in there. What they're saying is they didn't find it. They didn't write it. Therefore, we're presuming that they found the negative. And I don't think that's fair to the petitioner. When you're going to treatment records like this, if there's something in them that you can hang your hat on, the Commission gets to depend on it. But if there's nothing in them at all, and if it's a pneumoconiosis case, so there's no expert, and it's an obstructive lung disease case, there are no PFTs, there was absolutely nothing that these treatment doctors could have made a rational finding of disease on or lack of disease. And therefore, there's nothing to support the position of the Commission. As I understand, Dr. Westerfield, he's a certified bee reader, correct? That's correct. His testimony was that he found, he concluded that the claimant was not suffering from CWD. Dr. Kahn had a contrary opinion, obviously, except that Dr. Kahn is not a certified bee reader. Is that correct? Kahn is not. Alexander is a bee reader and a radiologist. So why couldn't the Commission, why can't we affirm on any basis in the record, Westerfield supports the finding that there was no evidence, in his opinion at least, of CWD? Like in most cases that went my way, if they'd written something different, they could go against me. And if the Commission said, we looked at this and we just picked Dr. Westerfield, nothing I could say. But they didn't say that. They said the opposite. They listed the credentials of Kahn and Alexander. They listed the credentials of Westerfield. Then they go right to the next paragraph and they say, we make our decision based on the treatment records. There's nothing in those. Are we bound by that? Pardon me? Are we bound by that or can we affirm on any basis in the record? You are, pardon me, I think that you are bound by the evidence that's in front of you. It's not a de novo deal where you can decide. If you have to stick with the witnesses, you have to stick with the respondents' witnesses. If they say something's irrelevant, I think that means it's irrelevant for the law of the case. But why would Westerfield's opinion be irrelevant? Had they depended on it, had they said it, then it wouldn't have been. But that's my subtle question. This is what I'm asking you. Why can't we decide to give way to Westerfield's testimony even if the Commission didn't, if it's in the record? Are we bound by the rationale of the Commission? I believe you are. Whether I'm right or wrong, that's another case. I don't know that you're right on that. I believe you are. Because the question is, is there support in the record for the Commission's decision? So you've got to look, what was the Commission's decision? The Commission's decision was, we decide this based on the treatment records. So then you say, is there any support in those treatment records? The answer is no. Then they say, well, yeah, but they could have done something else. Is there something that precludes us from doing that, that you're aware of? I don't know of anything that precludes you from doing anything, Your Honor. But except that, except that, I don't think that's the duty. I don't think that's the question. I think the question is, was the Commission correct in what it did? And on manifest way questions, did they have support for what they said? And the answer is, they did not. Now, another thing about this, had they not made all these egregious errors on the law, it would be another case entirely. But what you're seeing is a Commission that makes mistake after mistake on what the law is. I don't think there's any question about that they're wrong on notice. You had three experienced commissioners, didn't you? Well, I'm glad you asked that, because I wanted to bring that up and couldn't. This, I believe, was Commissioner Gore's first black lung case. It was his first black lung case that we had with him. And I think he'd only been on the Commission for a few weeks at the time, a very short period. And DeMuno just came on? DeMuno had been on there a year or so. Bursutto was pretty new, too. And this case went to Commissioner Gore, who I believe was to be looking out for labor. I was very shocked when this decision came back the way it came back. And I thought, we've got problems now, because that's the first decision that doesn't look good. Since that time, we haven't had that problem. But the answer is, no, this was a new panel. It was not an experienced panel. And the arbitrator that was overruled, he's probably the most experienced arbitrator in the state on black lung. So I didn't know whether it was proper for me to ask that question, not to bring it up. I appreciate what you did. Now, some of the things that Dr. Westerfield said. He said a minor can have radiographically significant pneumoconiosis, pardon me, and still have the same spirometry, blood gases, and physical exam of the chest as misreceived. And he said that if a minor's pneumoconiosis gives him symptoms, the most likely one would be sharpness of breath. But with simple pneumoconiosis, you wouldn't expect any symptoms at all. So, Consal's case can't be any stronger than the testimony of its own expert. And this is what I'm getting to. It can't be any stronger than the testimony of its own expert. That's why we take the depositions. So all the discussion by the commission about the treatment records and complaints of sharpness of breath are entries about clear lungs that don't have any relevance to the issue of disease, according to Consal's expert. By the evidence in this case, these treatment records couldn't be relevant in any way to the question of whether Mr. Siefert had pneumoconiosis. Now, the records do prove that there were cardiac problems. But there's nothing that says that his cardiac problems make his lung disease impossible or make it less likely. They're two separate things. There wasn't anything in these treatment records that could rule out the existence of x-ray pneumoconiosis. The experts, both of them, said that pneumoconiosis can cause obstruction. Both their PFTs showed an obstruction. And the treatment records didn't have any PFTs at all. And the critical testimony on the obstruction came from Dr. Westerfield. He said there's nothing in this data set that would rule out the possibility that there was some contribution to the obstruction from the coline exposure. And, Your Honor, it's just coming to me now. We were talking about pneumoconiosis, but there are two diseases here. And the second one is obstructive lung disease. It has the same consequences as pneumoconiosis. And Westerfield found obstructive disease. So did Kahn. And Westerfield also said there's nothing in the data set that would rule out the possibility that there was some contribution to the obstruction from coal mining exposures. There are some treatment records that could be relevant for some questions in some cases. But in this case, and the question being whether or not there's pneumoconiosis or obstructive lung disease, these treatment records can't do anything to rule it out or make it less likely. And that makes the commission's decision to fail the manifest weight test because their standard in determining whether there's pneumoconiosis or obstruction was the content of the treatment records. Again, if they just said we found Dr. Westerfield more credible on pneumoconiosis, I'd have had a problem. But they didn't. And the last thing about the commission's decision and the treatment records as wrong as a matter of law and that indicates the decision on disease was also against the manifest weight of the evidence was when it said, quote, there was obvious exposure to coal and rock dust and other hazards over the 28 years. But that's not proof positive that the petitioner developed pneumoconiosis, COPD, or emphysema as there are no treating medical records to indicate that. But proof positive isn't the legal standard. And no treating records could indicate it because the treaters never tested for it. Given this statement by the commission coupled with all the other legal errors, Mr. Seifer deserves a chance for his evidence to be heard again or for the decision of the arbitrator to be reinstated. Dr. Westerfield found an obstructive effect. But his testimony about it was full of conflict. He said CONS testing wasn't valid. But his results were almost identical. Westerfield's FEV1 was 74% of predictive. CONS was 75%. Seifert said he never smoked cigarettes. So Westerfield blamed the obstruction on the heart, even though he also said that he couldn't say for sure that the heart had actually damaged the lungs. He said there was no significant pulmonary impairment, but he also said that his PFTs would put Mr. Seifert at 10% to 25% impairment. Counsel, your time is up. You'll have time. Thank you. Time on rebuttal. Counsel plea. I'm going to provide a threshold question. Do you find it to be unusual for you to be standing there arguing to uphold the decision of the commission? It's a nice change. I'll just put it that way. Your Honors, Mr. Rezor, I disagree with the classification by Mr. Rezor that there was legal error in this decision. I will assume, and I will take notice out completely just to avoid the whole issue right now. But if you look at the commission decision, the first thing the commission did is they found that there was not an occupational disease. When this case was appealed from the arbitrator up to the commission, the issues on appeal were occupational disease, Section 1F, notice, 6C, statute of limitations. They addressed all of them. Did they have to? No. Once they found that he didn't have an occupational disease, we could have stopped. However, we also know that commission decisions, which have very little precedential value up here, are published down there to keep a uniform administration of the arbitrators. They were trying to address a few issues all at the same time. And whereas Mr. Rezor would prefer that they'd stop writing, I can say the same thing with other decisions that I've read. I wish they had stopped writing. In this one, I don't find that. With regard to the issues that Mr. Rezor has brought up, can medical records in and of themselves be the basis of a commission decision as to an award or to deny benefits in an occupational disease case? Yeah, they can. What Mr. Rezor wants these doctors to write is, we looked at Mr. Siefert today and he has shortness of breath and it is not due to coal dust. Okay, they're not going to do that. These are doctors. They sit down if he has shortness of breath. They're going to sit down what they think the causes of it are. They put what his condition was. His doctor said his shortness of breath is due to his cardiac condition. That's what the commission latched onto. And to say, oh, well, they weren't specifically looking for an occupational disease. There were eight chest x-rays. It's not like nobody looked at them and said, oh, look, there's something on there, maybe we should look for something. They didn't. They said no acute infiltrate, no pulmonary process. There was nothing there. So, yes, I believe the medical records in and of themselves are sufficient to affirm this decision without question. When you have 514 pages of medical records that span over 25 years of a man's life, and contain at least eight separate x-rays, and actually have one physician saying, hey, I think the shortness of breath is due to his cardiac problem, yeah, I think that's good enough. That alone. We don't have to search in the records like they put in their reply brief for a reason to affirm this decision. Now, if you want to make it a little stronger, you can tack on Dr. Westerfield, who came to the exact same conclusion they did. That was the question I wanted to ask you. Can't we affirm on any basis the evidence in the record, even if the commission didn't specify that basis? I believe that you can. I think the ultimate determination here is whether or not he's entitled to benefits if he has occupational disease. If you disagree with it being records, there's still Dr. Westerfield there in the record that you're going to have to overcome as well. Now, with regard to moving on to some of the other issues that were mentioned by Mr. Wazor, he takes these kind of out of order, which is why it's somewhat confusing. Like I said, they found there was no occupational disease first. And then when you go on through their decision, they address the 1F problem. And in the 1F problem, they're working on a disablement date of September 1999. That's the date that's on the application for benefits, which the little footnote number 2 says, date of accident, date of last exposure, disability, or death. That's the date that they have set as the disability date. Under the Act, the statute says you have to file your claim within 3 years of date of disability or 5 years within your date of last exposure if it's pneumoconiosis. The 3 years is to everything but. So whereas Mr. Wazor said, well, Dr. Westerfield found an obstructive condition, great. The claim was filed 4 years after the disability date that was signed by Mr. Seifert, which makes it outside the statute of limitations. All he had left after he filed this claim, 4 years naming a disability date of September 1999, was co-workers' pneumoconiosis. That was the only disease that was really out there for the Commission to find. Well, your opponent says that once the Commission finds that it's filed outside the applicable date, anything else that it says is different. Not necessarily, not under the ODA. Hold on a second. But is that really the issue? No. Or does he have the tail before the dog? You've got to first, in order for there to fall under 1F, there has to be an occupational disease. If the Commission has found there is no occupational disease, then the notice statement is the one that's dicta, not the question of whether he's entitled to recover at all. In this particular case, as I read this opinion, they turned around and found that he failed to meet his burden of establishing that he had any occupational disease to begin with. They turned around and said, finds that the evidence indicates that his petitioner's shortness of breath would be related to his cardiac condition. The totality of the evidence in testament indicates that the petitioner failed to meet his burden. If there's anything that occurs to me, it's the entire discussion of whether notice was proper. Because notice is irrelevant if there's no occupational disease. It occurs to me that if they added anything on that they shouldn't have added on, it was the discussion of notice. I would agree, and I would take it a step further. I would say anything beyond the fact that they found that he did not have an occupational disease would be dicta. You don't need to separate and discuss the three-year and the five-year statute of limitations. If you don't have it, you're not going to meet it under either one. Section 1F, which requires disablement, showing of an occupational disease within two years, it's irrelevant. When you actually provided notice to the employer, once again it becomes irrelevant. Like I said, these were issues we had on appeal before the commission panel from the arbitrator, because the arbitrator originally awarded benefits. And maybe Mr. Rezor suggested that the commission panel wasn't one of the more long-standing ones and perhaps they felt the need. I don't know. Maybe they did it because they were trying to provide guidance. They don't tell us why. They just have it in there. But with that said, I think the medical records in and of themselves, 514 pages, 25 years, no one finds anything. There's chest x-rays. There's plenty of doctors, specialists. None of them pulmonologists. One of them was an ear, nose, and throat doctor, according to the claimant. None of them said we think this might be due to the fact that you were a pulmonary, which those records do show that they all knew he was a pulmonary. So to say those aren't enough in and of themselves I think is really doing a disservice to the medical community. The only thing you have in the records is a statement by what one physician that shortness of breath is a cardiovascular problem, right? There is one physician who attributed it. It was Dr. Coelho who was actually a cardiologist who said that. But if you look at the records, which is what I can only assume the commission did, the times that Mr. Seifert complained about dyspnea, shortness on exertion, he would get treatment for his cardiac condition, which would then settle out the problem, and the next times he would go to the doctor, they weren't there anymore. I mean his most recent records in the record, which I kind of hated to say that, showed that his chest was clear, he had no complaints. So you don't go from I'm severely dyspneic, I need help, I can't breathe, to I have no complaints, I'm feeling well, it doesn't work that way. And if you look at what the doctors are saying, we're going to give him this medicine, we're going to give him that medicine, we're going to try this, and that's what they did. And the worst cases were when he was getting the major surgery in 96. That was the worst one of all. And that's when they put the pacemaker in and realized that that's what the problem was, and that's when the doctor was discussing, hey, this is why you feel this way, this is why you have no energy, because your heart's not pumping enough the way it's supposed to. So I think the medical records are enough. I think the medical records coupled with Dr. Westerfield push it over the top. I don't see that there's a legal error that's been committed here simply because medical records are enough in any case to decide if somebody should or should not get benefits. And there's no carving out in the Occupational Disease Act to say we're not going to use medical records here in the ODA. There's none of that. They've got stuff in their brief about what is CWP versus what is COPD. And it's like our statute says pneumoconiosis. Did they adopt the federal standard? No. Is there a whole different section for anything but pneumoconiosis? Yes, there is. And I think they're creating red herrings because the commission probably wrote more than it should have. And with that said, I think the decision is more than it needed to be, but I do think that there is enough in this record without question to make the finding that he did not have an occupational disease and should not have been awarded benefits. Does he have to have impairment of shortness of breath to recover? No. Just establishing the existence of the scar tissue, am I correct? That's what they say. And they have basically said that co-workers' pneumoconiosis can cause an impairment that is so minimal that it doesn't even show a loss of function. So, you know, in my own personal opinion, this doesn't matter, but if that non-measurable impairment is sufficient to make a one-decision diagnosis, then that's the decision of the commission or this court. One other issue with regard to the notice in this case, which in this case they specifically said there was no adequate notice, there was no timely notice, and that was a direct reference to the white decision that had come out with regard to notice from this appellate court. The reason it says that is because the case decision specifically stated, farther down from where it says, some notice, there's another sentence, another paragraph down that says, the prejudice inquiry does not pertain unless notice was given in the first place. The instant case does not involve timely but defective notice. It involves a lack of timely notice altogether. With regard to notice, the commission has the power to make the factual determination if as soon as practicable occurred when that claim was filed. If somebody writes a disablement date of September 1999 on their application, that's a factual determination the commission can make, that it was not as soon as practicable. I mean, you can file a claim and have it be good enough, which obviously can run up to the statute of limitations, but if it's an actual factual determination as to whether it's timely, as soon as practicable, four plus years after somebody leaves the mine and sets that as their disablement date, then that becomes a question of fact, which could also be affirmed in the event that this wasn't objected in the end. Thank you. Thank you. Rebuttal, please. Let me first mention, as you are aware, there are only four of us sitting here as a panel at the present time. Judge Stewart was recused from this case. Judge James Wexton is a member of this panel but not able to be present for this oral argument. He has had the benefit of reviewing the briefs in this case. He has had the benefit of reviewing the record. The oral argument presented today will be reviewed by him, and although he is not present today, he is an active participant in the decision-making process in this case. Please proceed. I want to talk to you about what Consall didn't say just now. On the statute of limitations, you didn't hear Consall say the statute for pneumoconiosis is less than five years or that Mr. Seifert filed his claim after five years. You didn't hear them say the statute for obstructive lung disease doesn't start running from the date of disabling or that it does start running from the date of last exposure. On notice, you didn't hear Consall say that they didn't get the app Mr. Seifert filed. You didn't hear them say that when they got the app, they had no idea Mr. Seifert was letting them know he thought he had a work-related lung disease. You didn't hear them say how they were prejudiced by not knowing Mr. Seifert was claiming a work-related lung disease when they got the app. You didn't hear them say that if the commission finds the statute of limitations has run, the claim can still file that app, and he can still have a fair arbitration with a chance to win on the merits. In other words, you didn't hear them say the claim isn't completely barred when the statute of limitations is run. You didn't hear them say that if the commission rules against a claimant on the issue of notice, that his claim isn't denied at that point. And you didn't hear them say that if the commission rules against a claimant on the issue of notice, he can go ahead and have a hearing on the merits with a chance to win, because the claim's already paid. If there's work going on, it's because the claim's already over. You didn't hear them deny, Dr. Westfield testified that a minor can have the same physical exam, PFDs, and blood tests as Mr. Seifer, and still have pneumoconiosis by x-ray. But you did hear them come up here and talk about clear lungs in the records. By their own doctors, clear lungs in the records can have nothing to do with x-ray by pneumoconiosis. Talked about shards of breath. By their own doctor, you don't have to have shards of breath to have pneumoconiosis. That also can't rule it out. You didn't hear them deny that their own experts said that there's nothing in this data set that could rule out the possibility that there was some contribution to the obstruction from the coal mining exposures. Or deny that he said he couldn't say for sure that Mr. Seifert's heart had actually damaged the lungs. And you didn't hear them deny that Dr. Westfield said that under the AMA guidelines, Mr. Seifert has impairment of 10 to 25%. Now, I asked you to look at Cassin's transport. The two cases. The one at the appellate court and the one at the Supreme Court. Because at the appellate court, the ruling was against the commission because it had no jurisdiction, but there was discussion of disability. And there was a dissent there by Justice Holdridge. When it got to the Supreme Court, at the very end of that Supreme Court decision, it says, because we said there's no jurisdiction, it's unnecessary to talk about disability. And it said the appellate court, when it talked about that, was improper. And that's all I'm saying is you have to go through the front door of these decisions. And as I read the Act, if you've blown the statute of limitations, that's it. You don't even get to five. There's no discussion of the issues. If there's no notice, you cannot proceed, shall not proceed. Therefore, you can't start talking about whether there's disease and then get to the other later because it never got on the table in the first place. And again, when we're talking about the manifest way of the evidence here, can we believe Dr. Westerfield? There becomes a point when you can't. I don't know how Dr. Westerfield can find an obstructive defect, and he did, and say that it's 10 to 25 percent disability by the AMA, and he did, and then say there's no obstructive disease and there's no impairment. That's clearly against the manifest way of the evidence. And I ask that the commission, I mean, ask that the court either reinstate the arbitrator's award or recognize that this case was barred from the outset by the commission on notice, statute of limitations, that they were wrong, and send it back to the commission for a fair hearing on the merits. Thank you. The court will take the matter under its private disposition.